Case number 16-2414. David Hylko Jr v. John Hemphill et al. Oral arguments. 15 minutes to be shared by plaintiff and amicus. 15 minutes to be shared by defendants. Mr. Nicholas B. Rommel for the appellant. Good morning, honorable judges. My name is Nicholas Rommel. I represent David Hylko. When a man subjects a woman to the behavior that David Hylko endured, that John Hemphill admitted in the U.S. deal found to have occurred, we don't question that it's because of sex. That is true even despite the reality that sexual harassment is fraught with many dynamics besides sex. It's about power. It's about control. It's accomplished physically and verbally through compliments and insults. And that's what Mr. Hemphill did to David Hylko. He touched his, I'm going to use frank language, he touched his ass, his genitals. He did it mockingly. He simulated anal sex. But then he also complimented him like when he complimented his physical conditioning or his nice firm ass and he cupped it in his hands. He made physical threats. He grabbed his shirt. He pulled him close and cocked his fist. He threatened to take him down to the river and kick his ass. He threatened his job. He threatened to fire him or send him back to the casters, which was the previous working place which was supposed to be dirtier and not as desirable as the BOP or basic oxygen processing where Hemphill said, please bring Hylko over here. He threatened him on multiple occasions to fire him. He belittled his military service. This is a man who led 100 combat missions in Afghanistan. He said, you can't, I'm surprised you didn't get your men killed. You can't lead them out of a paper bag. He called them stripes or Lieutenant Dan from the movies and gave them a mock salute. He belittled them to others. He called them effing worthless. You can have him. He made them get coffee for him in front of others. The talk was sexual. He called him a cocksucker. This is an act where you're on your knees. You're subjugated to somebody. Hemphill talked about his own sexual life and the ability, or he talked about Hylko's sexual life and his ability to please two women. He wouldn't let him change the subject. Then he would brag about his own genitalia and his son's genitalia on multiple occasions. Clearly he's somebody who was intrigued by Hylko sexually. He would be excited at these conversations and have this need to compare himself. But ultimately the harassment was on account of sex. That's what we're here saying that the lower court erred legally about. It's because it was emasculating. It was emasculating on so many levels. All of those things that David Hylko did, the military leadership, the physical conditioning, pleasing women sexually, we associate that with manliness. He was belittled on that basis. You're not a leader. Your military service was a joke. Mine is bigger and so is my son's. Hemphill told, despite all that, that he told to Hylko on the job, when he was called in for the interview, he told his superiors and the HR people, he's a good young kid. I like him. And he said, I am the teacher. This was all, you know, as in all sexual harassment cases, it really comes down to control. Now with women, we don't ask, is he really attracted to her or is it a power trip? It's just assumed that we say it's because of sex, because it's a man and a woman. But here, all the harassment was directed at Hylko's maleness and the things we associate with male prowess. And he turned them into what he said. You're my bitch. And that's the ultimate subjugation. You're my female slave. So yes, this is about sex. Oncal says we have to look at what they call the constellation of the surrounding circumstances in the social context. This isn't the example that Oncal used, a football coach patting a player on the fanny for a good play. And it's not horseplay either. I think the Smith versus Rockton looked at the very similar behavior and said that is clearly not horseplay. The jury had a right to determine otherwise. Somehow, these cases, though, they put these numbers in front of those non-exclusive examples that Oncal gave. They said one, two, and three. This is your test. But what Oncal said, of course, was whatever evidentiary route the plaintiff chooses. Here, there's the element of being sexually intrigued by Hylko and the fondling and the complimenting and talking like a woman. It's not just the belittling. Hemphill himself said, I would never treat a woman like that. And unlike some of the other cases in this circuit, this was a mixed-gender workplace. Tom Gunnell said there are about 35 women on the floor here. He says, I've got two other shift supervisors who are women like Hylko. So he's working in a mixed-gender workplace and said, I would never do that to a woman. One question I would like to ask you is you're familiar with the Vance case. Yes. And so, you know, the Vance case talks about what is the formulation they use over and over? A tangible action that has tangible economic. Sure. Tangible employment actions. Thank you. Tangible change in the terms and conditions of employment. So what would you point to in the record here that establishes that Hemphill had that kind of power over Hylko, as opposed to just something more amorphous, which is what the court seemed to reject in Vance? Well, we start with the fact that he initiated Hylko's transfer from Casters over to basic oxygen processing, a better environment, and he initiated that. Okay. So, I mean, that's, I guess I missed that. That's part of it. And then there's the multiple admissions. Parallel to what Vance said would not be enough? Right. But there's so much more in the record, Your Honor. Sorry? I believe there's a lot more in the record. And Gunnels, I believe, admitted that he would have the power to recommend termination. You don't have to necessarily have the power to terminate yourself, as long as you have that power to affect it. It's almost like the cat's paw theory. Anybody can recommend, right? Well, but he also had the power to recommend. The language in Vance v. Ball, I mean, I just read it in the last couple days. It's pretty sweeping. There's a couple. Yeah, you can call someone a supervisor. You can think of them as a supervisor. That person can tell you what to do. That person can change your activities. That's not enough. And they go through all these reasons. We want to know at the outset which kind of proof is going to be made at trial. And so we've got to have something that really shows that there's that kind of power. And you seem to be coming up with examples which have persuasive force, but I don't see how they have more persuasive force than what was argued in Vance. Well, here's a couple other considerations. There's no dispute that he threatened to fire him on many occasions. He admitted that. Now, he went to U.S. Steel, and U.S. Steel duly noted all that in their records. They, of course, called him a supervisor to the EEOC. They said, we found all of these things were true, that he threatened to fire him. Now, normally you say, wait a minute. Why are you threatening to fire him if you don't actually have the power to fire him? U.S. Steel didn't say that. I mean, he said, yeah, I threatened to fire him. Yeah, I admitted that. I threatened to send him back to Casters. They called him a supervisor to the EEOC. They admitted it in the pleadings. And there's one other quick factor that Ellerth talks about and Vance approves Ellerth. When they talk about the restatement, the restatement actually has two parts. And Ellerth talks about the apparent authority thing. And the apparent authority thing from the restatement is if you have a reasonable belief of that, then that can also support a finding of being a supervisor under Vance. That is because otherwise you'd be able to avoid liability simply by saying after the fact, well, oh, we just decided he can't really fire him. How can you prove otherwise? I mean, you can go through your entire career and not fire anybody, right? Now, whether you have the power or not is something only the higher-ups really know. But just the fact that you didn't actually fire anybody, is that going to be conclusive proof as a matter of law? These are questions of fact that should have gone to the lower court. And there's much more. Vance suggests that typically it should not go to the jury but should be resolved ahead of time. And it should be based on decisions that can be made ahead of time. It doesn't say you have to do that, but it says that's the reason we're coming to this definition. Is that fair? I think that is fair, but I don't think Vance says that's true of every case. They said this is a ---- No, they don't say it's true of every case. They said it can usually ---- But it would make it hard for you to come up and say this is the kind of thing that should go to the jury. Because the court is saying this is generally the kind of thing that shouldn't go to the jury.  I was surprised that they say that in such words. They say it's something that usually ---- You're right, Your Honor. Sorry, Your Honor. They say usually can be disposed of very easily. They do say that, but they also reason that the fact that it's usually can be disposed of is part of their reasoning that leads to this limited definition of what a supervisor is. I mean, that's part of their analysis. So do we dispose of it simply because they say after the fact, oh, he didn't really have the power to fire him? And how can I disprove a negative reason for that? Well, they say they address that in Vance. I mean, I don't have it in front of me, but they say that that's ---- You can get around that by making certain kinds of showings. I'm not sure that what you have is that kind of showing as opposed to the kind of thing that they reject in Vance. It's kind of a surprising decision, but it does seem to be what they say. I think that Ellerth argument, though, the apparent authority case, is also a path that Vance permits. Can I ask a technical question just from my orientation? Assume, I'm not sure we would, but assume that we disagree with you on the supervisor issue. That's one of the elements of the cause of action, so then you lose or you still have a claim against other parties or what? In that hypothetical possibility that we would rule that way on supervisor. What's left? Vance says you still have a claim on negligence, and that's ---- Oh, I understand that. And if you were to lose on that, is there a separate claim against the supervisors? Oh, there's the state court claims. The state court claims would be what might be left over. Right. No federal claim would be left. Probably not. Other than this co-worker liability alternative. Right. Then you'd have to get into whether the company reacted quickly enough and did enough to respond to the complaints that were made. There's a harder issue, and if I may, and my time is up. Sure. But if I can, may I, one other example that I think is interesting here. On co-worker thing, there was the one case when we asked about other cases of sexual harassment. They gave us a chart, and they listed in sexual harassment all the other cases, but one stood out. It was a female versus female co-worker, and they called it sexual harassment, and that was the Dobbins case I talk about in the brief. And what they found was the co-worker touched her hair, touched her necklace, and said some demeaning names. She got two 30-day unpaid suspensions for that. They treated the female victim of co-worker harassment much, and they also called it sexual harassment, which they deny here. They treated her much more seriously in that case. They also, Hemphill had shoved a person and got a 30-day unpaid suspension previously, and they sent him to counseling and anger management. So you've got them being unnoticed about Hemphill. They also had to think about him damaging somebody's car in a parking lot in their file for which he was sentenced into crime. So they know this guy is kind of a hothead. So there's those kinds of things that may also go with the co-worker liability, and there's also the cases that talk about when this goes on in front of other people, they're on constructive notice of all these things. So I wouldn't necessarily foreclose. I understand. I understand. And you have that in your briefs. I understand the court's concern with the advance issue. John, on Longwood, would you indulge me one more question? Yes. What is your sense from looking at the record entirely as to what it shows about what the motivation actually was? If I were to give a theory, I think it's like two gorillas in the jungle, you know, and you're not the top gorilla. I don't care about your manliness in military service. I'm your teacher. I'm going to subjugate you. I'm going to emasculate you. I'm going to kick your butt. I think that that's the theory. I'm your top dog. I'm the teacher. I'm sorry. Please. In your view, that would constitute sexual harassment. I think it's because of sex, because it's emasculating. I think that that's one of the evidentiary routes that I would be permitted to follow. It's sure woven in with this guy's sort of sexual obsessions or something. Sure. Yeah. Thank you, Your Honors. Counsel. Good morning, Your Honors. I'm Jeremy Horowitz with Amicus, the EEOC. And I wanted to make three points about the district court opinion in this case. First, the court erred in treating as exclusive on Clause 3 examples of ways to prove same-sex sexual harassment. I know other courts have weighed in. And part, I can't remember. Has our court weighed in on that exclusivity issue? No, Your Honor. It hasn't done that. The reason that we want to make the point in this case is because it does seem like courts more and more are using as a shorthand these examples, but treating them as exclusive. So this court hasn't yet ruled on the issue. Second, turning to the Vance issue that the two of you were interested in, Vance does stand for the proposition that somebody must be able to take tangible employment action in order to be a supervisor. But Vance also says at page 2452 that where you have a situation where those who can take that tangible employment action don't interact with the individual involved and instead rely on the recommendation of somebody who does interact with them, they've effectively delegated that authority to the person who has the power to make that recommendation. Now, that's helpful. Can you point us to any circuit cases or cases since Vance that give us some data points about what sort of recommending authority is sufficient under Vance and what isn't? Because recommend, as Judge Rogers pointed out, I mean, is a really broad thing. I mean, I could walk into a store and recommend, you know, you really should sell titanium fishing leaders, not just steel ones. You know, I'm sure everyone feels that way. But, you know, they don't have to do anything with it. So are there any data points out there? So there's the Cramer v. Wasatch case, which really does look at what is required to have that kind of authority. Cramer v. Wasatch, it's cited in our briefs. It's a Tenth Circuit. All right. And that case really does look at this idea of what is required. And one of the points is who does the person work with, this individual. And here, Mr. Hemphill was really the only person who worked with Mr. Hilko and the only person in that position. And in addition, I think the cases that look at how the person is treated, sorry, how the purported supervisor is referred to. Here, U.S. Steel and Mr. Hemphill himself and Mr. Hilko all routinely referred to him as a supervisor. I guess, I mean, do you have any cases that you think are pretty factually similar on the supervisory authority issue here? That you point to and say, you know, it's kind of like this case, it's kind of like that case. So in addition to Ellerth and the hypothetical advance, I really would focus on that Cramer case. Okay. In addition, I wanted to talk about how, as applied here, the harassment, the record clearly shows that there was a tribal issue of material fact as to whether this was harassment because of sex. Where you have the evidence that Mr. Rumel talked about, about the touching of the buttocks, the touching of the penis, the comments about having a nice firm ass, all of that, it's so inherently sexualized and then with the overlay of the actual physical contact with intimate body parts. Given all of that, that makes the connection to sex that Title VII requires. You don't need anything different. Sex has a lot of different meanings. Are we talking about sex in terms of, like, a physical action? Are we talking about sex in terms of gender when you say what you just said? Both, Your Honor. It's talking about. Is it enough to have discrimination in the gender sense? Is that enough? Or does it have to be based somehow on a desire to have sex? I think you can have discrimination on the gender sense or on the power sense. If I could commend to the Court the Doe v. City of Belleville decision, that goes into how it really doesn't matter what the harasser's motivation is. What you look at is the conduct. I think on call said that too. On call said that as well, as did Renee, the Ninth Circuit case that really does look at the issue in a fair amount of detail. And all of those, when the type of harassment takes this form of being inherently sexualized, it really doesn't matter whether it's because of sexual desire or some other reason. The City of Belleville decision points out if somebody is referred to in racist or religiously discriminatory terms, even if the harasser doesn't actually harbor that kind of animus, they're just trying to get rid of the person, trying to really hurt them in the most fundamental way, if they take that route, that's enough under Title VII. And so we would say that's what's happening here as well. But even if the Court, contrary to what we would hope, even if the Court does only look at the on-call examples, there's still enough to show on a comparative basis that because the workplace was 10% female, women were distributed evenly throughout, and Mr. Hemphill testified that he wouldn't treat women the same way because it would be, in his words, inappropriate. That's enough to establish the comparative case under this Court's decision in Rockville. I have a question on that as to how far that point extends. If, for example, it was clear that the reason for the bad treatment was that the victim was dating his ex-wife, but the form of harassment included some things that were sexual in nature, would that satisfy it? Even though it was clear that the motivation itself had nothing to do with sex? I would say, yes, it does, Your Honor, in the same way that a racial epithet in the same context would similarly run afoul of Title VII. Well, a racial epithet is generally directed at somebody of the race, though. Correct. And this one, I mean, if it was a sexually demeaning term that was used, it was directed at this hypothetical victim as a man, that I think the case law under Oncall and the other cases interpreting it, I believe that does state that that would be enough. But specifically here, where there's, in addition to that, the overlay of the physical contact, case after case says that among the most extreme forms of sexual harassment is this unwanted physical contact with intimate body parts. And where the record shows that that happened multiple times over a very compressed period of time, too, the time that the two men worked together, I believe it was two months, and of that, there were two weeks when one or the other was on vacation. So it's within six weeks that that happened. So where you have that overlay of the physical contact and it's repeated and the evidence shows that it could be considered hostile or abusive sufficiently to alter the conditions of employment, I believe that's enough under Title VII. I see my time's up, but if the Court has any other questions. Thank you, Your Honors. May I take five minutes, please? You're going to take five minutes and your co-counsel is going to take ten? Yes. Okay. And I'm going to address the because of sex element. So let's understand first, the lower court never said that the three evidentiary routes,  were the exclusive means to do that. It's simply a red herring that had been raised here by Amicus and the appellant. The court didn't consider anything else, did it? Judge, because that's all that was advanced. There was no other argument made in the lower court by Mr. Hilko, right? And so the court addressed the arguments that were raised. But the fact that he directly testifies that he would not have done any of this to a woman. Why doesn't that just direct? Forget the examples. It's a direct answer to the question posed by Uncall, namely, was he, quote, exposed to disadvantaged terms or conditions of employment to which members of the other sex are not exposed? That's from Uncall. Why doesn't that answer that directly? It's not a mixed-sex workplace, right? And that's simply hypothetical. Wait a minute. I mean, nobody, no woman is exposed to that behavior because he said he wouldn't do it, right? I mean, I'm just trying to, this seems to be common sense to me. What am I missing? Because what Uncall says is you have to have actual acts, comparative acts. No, it doesn't. It doesn't say that. That's one example. You know, I got it in front of me. I have that advantage. A same-sex harassment plaintiff may also, of course, offer comparative evidence. That's not exclusive. It's not a requirement. It's just one in a litany of examples of ways that you can show discrimination because of sex. I understand that, Your Honor, and I didn't mean to imply otherwise. What that evidentiary route means is you can show comparative evidence, that is, the way that the harasser acted. Right, but if the harasser raises his hand and says, forget about inferences from conduct, I'll just tell you straight up, I wouldn't do that to a woman, and, you know, and he did it to this guy. I mean, this is like, you know, the rare Title VII case kind of where you have direct evidence rather than have to go through all this inferential stuff. What am I missing? He said I wouldn't do this to a woman. He did it to the man, stipulated, obviously, and he testified he wouldn't do it to a woman. Why can't we just take him at his word, particularly on summary judgment? Well, I don't think that in and of itself makes it gender-based, right? He had a relationship with... Why? Why not? I did it to this man. I would never do it to a woman. Why is this so complicated? Well, I'm not saying it's complicated. I'm saying that that's just not fair to say when you've not presented it with it in the workplace, and for him to present this is what happened, and I just don't think you can make a conclusion. It would have made sense if he had added, and I'm a hetero, in which case maybe one action is sexual if it's done to a man and not sexual. Well, he is hetero. That's the testimony. All right. So that's what I'm suggesting. Why isn't your answer simply that this statement is not discriminatory when you take into account the fact that I'm not a gay, and so therefore I wouldn't do it to a woman? It would be sexual if I did it to a woman, but I'm doing it to a man, and so therefore it's not sexual. I'll adopt that answer. Well, I mean, on call says harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. So you can let me finish, and then you can answer the question. So why doesn't that exclude, I mean, why doesn't that mean that his testimony is enough because it's because of sex? Again, it's, I just don't think that you can take that example without comparing it to actual actions in the workplace and draw from that that it was actions on account of sex, on account of his gender. Okay. What we have here, I'm running out of time. What we have here is what Wasik said, you know, that Title VII does not apply to the conduct of jerks, bullies, and persecutors. It's simply not actionable under Title VII unless they're acting because of the victim's gender. I would add to that litany, infantile behavior, which is what we have here, and just close, and that there is no evidence that it was because of sex. This is just horseplay. Thank you. Thank you, Counselor. We'll hear from your co-counselor. Good morning, Your Honors. Paul Koganow on behalf of the Appellee United States Steel Corporation. I'm going to wade right in and try to answer your question as I saw it. First of all, the testimony, I think, is out of context. The question was, did you ever do that to women back in your party days, so to speak? No. Not something you would go up to a woman and tap her on the ass? No. You knew that was inappropriate? Right. That's correct. Those are attitudes, historical evidence, his subjective opinion. It's not on Cowley's standard, which is where the plaintiff offers direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace. Okay. But, again, that is part of this litany of different ways one can show that members of one sex are exposed to disadvantaged terms and conditions to which members of the other sex aren't. Which they never presented evidence of. They never asked, how did you treat women in the workplace, Mr. Hill? And there were none. But they did cite to the district court his testimony, the testimony you just referenced, right? Right. Which was his attitude or subjective attitude. And that's a helpful clarification of the context of it. However, you know, the case comes to us in summary judgment. And we have to look at it in the light most favorable to the plaintiff here. So why shouldn't we conclude that a jury could find that he brought those same more protective, I guess, attitudes about women forward into his role at U.S. Steel? I think perhaps it could if it was a mixed-sex workplace. But there is no evidence. The evidence they've cited is taken out of context as well. Both Mr. Hilko and Mr. Hemphill testified there were no women that they worked with on their crews in the BOP basic oxygen processing. It was a separate building. They've taken testimony of Mr. Gunnell that he had 348 people working under him. They've ignored, he said, only 140 of those people were in the BOP building. And there is not a single bit of evidence in the record that any one of those 140 people was a woman. It was never presented. Okay. So, I mean, I think we're narrowing this down. So you're saying that there are no evidence that there are any women in this building. Right. And so I guess it depends on how do we define the workplace, right? Fair enough. And I think there's two cases I'd direct to the court, the Herbert-Yergin case from this court in 2001, and more specifically on that point you just raised. Yergin is the name of the case? Yergin, yeah. Herbert Yergin. I'm sorry. Are we talking Y or J here? Y-E-A-R-G. All right, great. I'm sorry. That's all right. In Johnson v. Hondo, which is a Seventh Circuit case, and that did get particularized from 1997 to the area of the workplace. There were none in that area. So in the Herbert Yergin case also, there were three women, but they were in the office. So it's sort of similar when they're not in that workplace. This is a very difficult workplace. It doesn't mean women shouldn't be there or can't be there. It's just that they weren't there as far as the record goes. Okay. Thank you. Thank you. I would like to address, although I think the court has addressed at the Vance issue, the specific changes, the significant changes in employment status were identified in that case as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. He's relying on firing, I think. I'm sorry? He's relying on firing. But he said that, and it is in the record, but there's no evidence he did have that authority. The fact that he said, I'm going to fire you, evidence that he had that authority. I think it was the bullying argument that he made before. It was just his way to mess with the guy, give him a little grief. There's no evidence he had ever recommended the discharge of any employee at that level. So what he did was recommend discharge of union employees, and that's not what Mr. Hillcoe was. Didn't the HR supervisor say that at least Hemphill could make recommendations? He did. He did. But I think we have to evaluate, was there any, could he make an effective recommendation or delegation of authority? He had never done so in the 30 years. Some of that was before with National Steel, but he had never done so. And normally we don't have this fact scenario. There's evidence. You know who your supervisor is. He evaluates you. He does some of these things. No evidence of evaluation or anything like that here? Correct. It was teaching. It was showing him the robes. It was assigning the duties. He was new to the BOP, and it is a very dangerous work environment. The client may not appreciate me saying that. In your view, who was Mr. Hillcoe's supervisor? Mark Jobin. And that's Mr. What was his job again? I'm sorry. I don't have his title. Was he in the same building? Yes. Oh, yes, yes. And functionally, what was he doing? He was supervising that level of manager. He was above Mr. Hillcoe, Mr. Hemphill. He was supervising the shift managers and coordinators. I think there is an organization chart. Okay. I know there is. In the record? Yes. And I'm sorry that I don't have it with me. All right. And that's Mr. Gunnell, just to fill in the gap. When Mr. Hillcoe came to him and brought this complaint forward, which was the first time anyone had heard about it, and that will lead me to my employer liability argument here in a moment. The first thing he did after speaking with Mr. Hillcoe was call Mr. Jobin and say, hey, you know, I don't know if you use these words, so I'm playacting, but, hey, your guy just came to me and said this is going on. Do you know anything about it? He said, no, I've never heard about it, never seen it, et cetera. Does that tie into the EEOC's point or somebody's point earlier on that side about if the actual supervisor doesn't interact, then one should say there's been a delegation to the person who is interacting, or maybe that gives more weight to the recommendation? Well, Mr. Jobin, I think, did interact. I don't think that there's evidence. He just didn't know about this nonsense? Right. And Mr. Hillcoe testified that there was never a supervisor around for this conduct. So other witnesses also testified they weren't aware of it, but I understand it's a fact record and you have to look at the facts as play. I would like to address the employer liability, though. Obviously the test turns on whether or not he was a supervisor. That is Mr. Hemphill. We submit he wasn't, and that there's no basis for a finding of negligence whatsoever. That requires a failure to take prompt and corrective action when it's brought to the attention, and the response, if there is one, it must manifest indifference or unreasonableness. U.S. Steel took quick action. It investigated. The very next day it brought in Mr. Hillcoe for a more thorough interview, brought in Mr. Hemphill for a thorough interview, took immediate action to separate them before that had even happened. And I do have to address that. Was that action that they took simply because there was some tension or conflict, but not because it was sexual? I mean, I thought their position was this doesn't come under their sexual harassment policy. Well, they didn't say it did or it didn't. They just knew it was inappropriate behavior under their policy, sexual harassment policy. They took action. That was under their sexual harassment. What evidence, I guess, is there that the action that they took, and it does appear they took some action, was under their sexual harassment policy? It's a great question, Your Honor. I'm not sure that anyone said those words in the record. It's what they, I think, were operating under. But can I cite you to a specific court site? Could they have taken that action if it had not been under their policy? I'm sorry? Could they have taken that action if it had not? Of course. Of course. But I think they understood him to be alleging sexual harassment, and that's why the policy was relevant. What they were saying in their testimony is we're not concluding it was sexual, just like we're all arguing about here. They didn't decide it was or it wasn't. It was just wrong. And they felt it was appropriate to separate. Both parties agreed to that separation, plus the five-day unpaid suspension. I think the record is clear it was unpaid, plus a referral to the EAP, plus a warning against any future conduct, plus he apologized, and Mr. Hilko accepted the apology. He wasn't forced to. He was asked if he could and would, and he said yes. And there's a text from him to his girlfriend. Is it fair, though, to say, as the plaintiff does, that there were instances where discrimination or similar bad conduct towards women was treated way more severely than his conduct was treated? No, I don't think it's fair to say that. Those were snippets of a record without the full investigative file. He didn't subpoena or request the full files. Those were short, little actions. Plus, I would say to this Court, that's a question of discrimination, which is not before it was not raised. It's really a question of discriminatory sort of enforcement of policies, which is not before this Court. It's a question of harassment in this case. And I see my time's up. Questions? Just one last question. It's the same one I concluded with your opponent on. I recognize there's another step in terms of your liability. Just because Mr. Hemphill may have done something wrong doesn't mean you did. But the reverse of that is if he did nothing wrong, then you would have no liability without even going through the other steps. And I'm troubled by the question of if a person chooses to torture, in effect, someone in the workplace by calling him names that suggest he's a homosexual, by using conduct that he might use if he was a homosexual, even though he knows this person isn't leaning in that direction, would that be actionable if that's the device he uses to make one's life miserable? I would say no based on the Onkali standard that we have walked through quite a bit here today. Onkali says because it is same-sex harassment, it does acknowledge it's a little different. And so they laid out a parameter or a framework for analyzing that. I'm not saying it's exclusive. I agree with Brother Counsel and adopt his comments. I don't think the Court said that, and I don't think Plaintiff presented any other argument. So that's how I would respond. Thank you. Thank you all. Did you get rebuttal time from the deputy ahead of time? Thank you. How much time does he have? Two minutes. Hopefully two points. First of all, very quickly on the comparative evidence bit, that's enough to go to the jury. The admission that Hemphill made, the mixed-gender workplace, the 35 people, that's what distinguishes from Herbert Yargin and Wasik. I think those were the ones where only one or two people were in the mixed-gender workplace. That's enough for a factual issue on that. The Vance issue I'd like to address a little bit more, too. And your Honor asked about some other cases. Volts v. City of Erie, which is a Sixth Circuit 2015 case that's cited in our brief, talks about where the cat's paw theory is enough. And there is an article. It's not cited, but really it's drawn from the case. It's a Northwestern University 2015 Law Review article by Daniel Lee, L-E-I-G-H, where they talk about those agency principles that are cited in Ellerth, where they cite and they essentially endorse the cat's paw theory as a means. Volts cited Ellerth and Vance to support, and Staub v. Proctor, excuse me, the cat's paw to support its finding that the person was a supervisor. And Ellerth has a lot of great language at 762 and 763, where you say you'd be turning agency principles on its head if you didn't find that the supervisor had power to take tangible employment actions, even if the actual employment action is made by the imprimatur of the enterprise and its internal processes to formalize it. Because from the perspective of the employee, the supervisor and the employee merge into a single entity. Certainly when Justice Alito talked in Vance about those agency factors. I think you could certainly have some room for saying that it can be delegated and so forth. You have to look at particular circumstances. I'm just curious about the thrust of the Vance opinion, which is to steer away from sort of, well, he told me what to do, and if I didn't do it, I'd probably get fired because I wasn't doing what I was told to do. Therefore, he's my supervisor. It seems to me Vance is saying, no, that's not enough. You've got to have something that's more objective, that you don't have to look to day-to-day activities, but you've got to look somehow to the, they don't say it has to be the structure, but it's got to be something that we can ascertain objectively before this thing goes to trial. So, yeah, there's got to be some room for delegation in the various kinds of organizational structures that exist within the economy. But just having testimony that he was called a boss or that he was told, this is what you have to do today, you're going to work on the casters or you're going to work in the clean area, or that he was threatened with repercussions if he didn't do what he was told, all that pretty clearly under Vance isn't enough. I understand the Court's concern there, but I think Justice Alito in Vance did endorse that delegation theory. He said, if you rely on other workers who actually interact with the affected employee for the ultimate decision, it's not enough. The evidence we have is just the other workers saying, I'm going to get you fired. I think that's different here. What he was saying was, I will fire you. I will send you back to casters, not I'm going to tell on you and get you fired. If you look at it in the transcript, it's right in the same sentence with, I'm going to send you down to the casters, and I'll get you fired, or I'll fire you, or whatever it is he throws in at the end. And I can fire you. Their investigation, if you look at Van Buren and Kowalczyk's notes, he says, quote, he threatened to fire me on many occasions. I understand the Court's concern. I appreciate it. We believe it's in the record. One last question, just informational in nature. The existing cause of action at this time against Hemphill is what? Against Hemphill, under state law, you can have individual liability versus a supervisor, not Title VII. So we have the state law claim individually against Hemphill and the state law tort claims for the assault and battery. My question, I guess, is all of your claims against Hemphill are state law claims. That is correct, Your Honor. Thank you. Unless the Court has questions? No, thank you. I very much appreciate the Court's time today. Thank you. Thank you. The case will be submitted. Please call the next case.